## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

MAURICE PRISSERT and CLAUDE
PRISSERT, Individually and on Behalf of All
Others Similarly Situated,

        Plaintiffs,

vs.

EMCORE CORPORATION, et al.,

        Defendants.

No. 08-CV-1190 MV/KBM

(Consolidated with
No. 09-CV-133 JCH/RLP)

<u>CLASS ACTION</u>

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants' Motion to Dismiss Plaintiffs'

First Corrected Consolidated, Amended Complaint [Doc. 81].   The Court, having considered the

motion, briefs, relevant law and being otherwise fully informed, finds that the Motion is well-taken

and will be GRANTED.

## <u>BACKGROUND</u>

EMCORE, a company with principal offices in Albuquerque, New Mexico, is a provider of

compound semiconductor-based products for the broadband, fiber optics, satellite, and terrestrial

solar power markets.   Doc. 79 ¶ 16.   EMCORE's terrestrial solar power systems are at issue in

this case.   *Id.* ¶ 2.   Solar power generation systems use photovoltaic cells to convert sunlight to

electricity.   *Id.* ¶ 3.   To intensify energy levels and increase the amount of electricity generated,

solar power applications rely on concentrating photovoltaic systems, which use powerful

magnifying lenses to concentrate solar rays onto multi-junction solar cells.   *Id.* ¶ 2 n.1.

EMCORE manufactures and sells both multi-junction "solar cells" and "receiver assemblies" to its

1

customers.  *Id.*  Defendants Adam Gushard, Dr. Hong Q. Hou, Reuben F. Richards, Jr., and David Danzilio (the "Individual Defendants") are current or former executives, officers, and directors of EMCORE.  *Id.* ¶¶ 17-21.

From June 12, 2007 through June 30, 2008, the "Class Period," Defendants announced a series of four contracts into which EMCORE had entered for the manufacture and sale of its terrestrial solar products.  *Id.* ¶ 5.  First, on June 12, 2007, Defendants announced that EMCORE had entered into a "strategic supply agreement" with Green and Gold Energy ("GGE") to supply terrestrial solar cells for use in GGE's "SunCube" product.  *Id.* ¶ 28.  Next, on August 29, 2007, Defendants announced that EMCORE was awarded a "follow-on production order" from GGE for three million solar cells for use in GGE's SunCube product.  *Id.* ¶ 34.  Defendants described this "105 MW purchase order" as "the largest procurement of concentrator solar cells in the industry to date," and noted that it was "a follow-on order to an initial 5 MV order placed earlier this year." *Id.*  On October 11, 2007, during a quarterly earnings conference call with securities analysts and investors, Defendants again discussed the two transactions with GGE, stating:  "we were awarded a "$24 million contract for solar cells to be delivered in fiscal '08.  That order from GGE has since been expanded to include receivers, increasing the value of the purchase to $30 million to $35 million."  *Id.* ¶ 37.  Third, on February 27, 2008, Defendants announced that it received from GGE an additional "follow-on production order of $39 million for additional solar cell receiver assemblies."  *Id.* ¶ 78.  Defendants further reported that the "current backlog for this product line has increased to approximately $86 million."  *Id.*  Finally, on May 5, 2008, Defendants announced a $28 million order for concentrator solar cell receivers from ES System.  *Id.* ¶ 87. Prior to this contract, ES System had been procuring EMCORE receivers under a supply agreement with GGE.  *Id.*  EMCORE reported that GGE had been encouraging "direct supply

2

relationships" between EMCORE and its major licensees, including ES System.  *Id.*  On several occasions during the Class Period, Defendants reported increases in order backlog based at least in part on the contracts with GGE and ES System.  *Id.* ¶¶ 38-39, 55-56, 64, 68-69, 88-89.

On or about December 19, 2007, Defendant Hou sold 120,000 shares of EMCORE stock, at a price of almost $14 per share, earning approximately $1.6 million from the sales.  *Id.* ¶¶ 110-111.  In or about early 2008, EMCORE's stock price was "almost $16 per share"; a year earlier it had been $4.  *Id.* ¶ 6.  On February 15, 2008, EMCORE issued a press release announcing a private placement of stock, which raised $100 million in capital.  *Id.* ¶ 77.

On March 18, 2008, Citron Research published a report (the "Citron Report") stating that "Emcore's solar business is built on a foundation of illusions," and contending that "Emcore has strung together a group of sham deals to make it appear to be a player in the terrestrial solar business."  *Id.* ¶ 82.  Specifically, the Citron Report stated:

> Emcore is banking heavily on Green and Gold Energy as a critical part of Emcore's backlog. . . . The question is whether there is any prospect whatsoever of Green and Gold being able to pay for this order.
>
> Citron has done considerable research on Green and Gold and believes the company does not have the money or capacity to fulfill the purchase commitments reflected in these press releases.
>
> Emcore has admitted that it has received only $500,000 from Green and Gold. Citron believes that whatever it has received is the only money it will ever see from this fantasy, and it is the height of corporate malfeasance to use any of the $65m or $78m claimed for future sales to Green and Gold as part of its revenue guidance. They've had over six months to do their own due diligence, but they persist in insisting this customer is the anchor of their backlog.

*Id.* ¶ 82.  The Citron Report further questioned the *bona fides* of four additional EMCORE customers.  *Id.* ¶ 83.  That same day, EMCORE's stock price dropped from $8.84 per share to $6.78 per share.  *Id.* ¶ 84.

On June 30, 2008, Canaccord Adams issued an analyst report on EMCORE (the "Cannaccord Report").   *Id.* ¶ 94.   The analyst reported meeting with ES System's management in Korea, and touring its facility and solar site.   *Id.*   Describing the "impact" of that meeting as "mixed," the report stated:

> We believe market expectations of 70 MWs with ES System (based on company announcements) are overstated.   Specifically, we identified plans for only 45.4MV, of which only 900KWs is under construction and the remaining 44.6MW weighted to one 30MV contract.   While our meeting suggested confusion over what was funded and won (possibly translation), several follow-up calls with EMCORE suggest management is satisfied the full 70MWs will be recognized and completed as well as being fully funded and permitted.   Our meeting did not inspire the same confidence.   Separately, we attempted to schedule a follow-up meeting with EM Solar, the EMCORE JV announced December 17, 2007, which we first met with in March '08 and had a positive take-away.   Unfortunately, EM Solar appears to be undergoing a corporate re-org with several moving parts, none of which bolster our confidence in the previously announced 5.7MV of system sales and 14.3MV annual follow-on sales.

*Id.*   The Canaccord Report concluded:

> We expect EMCORE to post a relatively in-line quarter and speak positively about upcoming solar contracts.   We continue to believe that EMCORE – as one of two major suppliers of CPV solar cells and receivers – should be well positioned when this market ramps.   Unfortunately, we feel that expectations have gotten ahead of themselves, in spite of the sell-off.   Further, to deliver on announced contracts would be likely to perpetuate management's lack of credibility, a key overhang with this stock.   Given our recent two meetings in Korea, we question the ability of either ES System or EM Solar to deliver on the 70MW and 5.7MV/14.3MV expectations, respectively.   As such, we are downgrading to HOLD, as we believe the stock adequately reflects the risk.

*Id.* ¶ 95.   Over the two-day period from June 30 to July 1, 2008, EMCORE's stock price declined $1.65 per share (23 percent), to close on July 1, 2008 at $5.58 per share.   *Id.* ¶ 96.

On September 30, 2008, EMCORE announced that its order backlog had declined to approximately $56.3 million, which reflected the cancellation of the GGE contract.   *Id.* ¶ 97.   In December 2008, two putative class action complaints were filed against

4

EMCORE and several of its officers and directors, asserting claims for violation of the federal securities laws.   Those complaints were predicated on the allegation that EMCORE misrepresented its customer, GGE, as a "world-leading CPV system provider," when, the plaintiffs alleged, GGE was a sham company that lacked production capacity, was poorly managed, and had virtually no chance of fulfilling its contractual commitments. Doc. 1 ¶ 17.   The complaints alleged that the truth was revealed to the market in March 2008, when the Citron Report was published, raising "questions" about GGE's ability "to pay for its orders or otherwise complete its agreements with EMCORE."   *Id.*   The Court subsequently consolidated these cases, appointed IBEW lead plaintiff, and ordered Plaintiffs to file a consolidated complaint.

On December 9, 2011, Plaintiffs filed their Corrected Consolidated, Amended Complaint (the "Complaint").   Doc. 79.   Unlike the prior complaints, the Complaint does not allege that GGE was a sham company that could not meet its contractual commitments.   Rather, the Complaint alleges that Defendants' announcements regarding (1) EMCORE's contracts with GGE and ES System and (2) EMCORE's resulting order backlog were materially false and misleading and failed to disclose material information for three reasons.   First, Plaintiffs allege that EMCORE knew that it could not fulfill GGE's first two purchase orders for cells because, according to EMCORE's contract with GGE, the cells had to have a 90 percent or higher efficiency rate, and at the time the contracts were executed, the cells EMCORE was manufacturing had a far lower efficiency rate.   *Id.* ¶ 105.   Nonetheless, Plaintiffs allege, these two purchase orders were put into EMCORE's backlog.   *Id.*   Second, Plaintiffs allege that GGE's third purchase order replaced the first two purchase orders.   *Id.* ¶ 103.   The first two orders, however, were not removed from EMCORE's backlog, and the third purchase order was also put into

EMCORE's backlog. *Id.* ¶ 106. Third, Plaintiffs allege that ES System's order reduced GGE's final purchase order by two million receivers. *Id.* ¶ 104. Defendants did not adjust EMCORE's backlog to reflect this change, and added the ES System's order to the backlog reported to investors. *Id.* ¶ 92(c). The Complaint further alleges that Defendants' false statements and omissions regarding the GGE and ES System contracts and the extent of EMCORE's backlog caused EMCORE stock to trade at artificially inflated levels during the Class Period, and that the revelation of "the nature and extent of Defendants' prior false statements and omissions" through the Citron Report and the Canaccord Report caused the decline in EMCORE's stock price at the end of the Class Period. *Id.* ¶¶ 114-117. Accordingly, the Complaint alleges, Plaintiffs and the putative class members, who purchased EMCORE stock during the Class Period, suffered economic loss "as a direct result of defendants' fraudulent course of conduct which artificially inflated EMCORE's stock price and maintained the price at artificially inflated levels and the subsequent significant decline in the value of EMCORE's stock when defendants' prior misrepresentations and omissions were revealed." *Id.* ¶ 117.

Based on these allegations, the Complaint asserts two claims for relief. Count I alleges, against EMCORE and the Individual Defendants, a violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. Section 78j(b), and Rule 10b-5, 17 C.F.R. Section 240.10b-5. Count II alleges, against the Individual Defendants, a claim of "control person" liability under Section 20(a) of the Exchange Act, 15 U.S.C. Section 78t(a).

On January 9, 2012, Defendants filed a motion to dismiss the Complaint in its entirety, along with a memorandum of law in support. Docs. 81-82. On February 23, 2012, Plaintiffs filed a response opposing the motion. Doc. 87. Defendants' reply followed on March 26, 2012. Doc. 91.

## STANDARD ON MOTION TO DISMISS IN SECURITIES FRAUD CASES

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint."   *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).   When considering a 12(b)(6) motion, the Court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1142 (2010).   The Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Accordingly, while the Court must take all of the factual allegations in the complaint as true, "a plaintiff armed with nothing more than conclusions" cannot survive a motion to dismiss.   *Iqbal*, 556 U.S. at 679.

The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. Section 78u-4(b), and Rule 9(b) of the Federal Rules of Civil Procedure subject plaintiffs in securities

fraud actions to heightened pleading standards.  *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095-96 (10th Cir. 2003).   While Rule 9(b) generally requires plaintiffs pleading fraud to do so with sufficient particularity, plaintiffs in securities fraud cases have two additional burdens. First, any private securities complaint alleging that the defendant made a false or misleading statement must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.* at 1095 (quoting 15 U.S.C. § 78u-4(b)(1)).   Second, plaintiffs alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at 1096 (quoting 15 U.S.C. § 78u-4(b)(2)).   The Court must dismiss a complaint that fails to meet either of these requirements.  *See* 15 U.S.C. § 78u-4(b)(3).

## DISCUSSION

### I.    Count I:   Securities Fraud Claim Under Section 10(b) and Rule 10b-5

"Private federal securities fraud actions are based upon federal securities statutes and their implementing regulations."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005).   Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."   15 U.S.C. § 78j(b).   SEC Rule 10b-5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."   17 C.F.R. § 240.10b-5 (2004).   "The courts have implied from these statutes and Rule a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation."

8

*Dura*, 544 U.S. at 341.

In cases involving publicly traded securities and purchases and sales in public securities markets, the elements of a fraud action are: (1) a material misrepresentation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Id.* at 341-42.   Defendants argue that the Complaint's allegations are inadequate with respect to the first, second and sixth elements. Specifically, Defendants argue that the Complaint fails to allege a statement that was false or misleading when made, fails to allege that Defendants acted with scienter, and does not adequately plead loss causation.

      A.    Material Misrepresentations or Omissions

      1.    Statements Concerning the GGE and ES System Contracts

Plaintiffs essentially allege three false or misleading statements of material fact by Defendants: (1) EMCORE's order backlog was inflated because it included "GGE and EMCORE's contract" orders requiring EMCORE to meet 90 percent efficiency standards, which EMCORE could not do; (2) the amendments to GGE's purchase orders "replaced [GGE's] prior [] orders for solar cells" and the prior purchase orders "were nullified, the price term was modified to $13 per unit, and [GGE] and [EMCORE] signed off on the changes"; and (3) EMCORE misrepresented or overstated the backlog because the "ESS [purchase] order reduced GGE's [] 2008 purchase order by two million receivers, reducing the quantity to four million."   Doc. 79 ¶¶ 31, 44, 50, 66, 70, 75, 92, 103-105.   Defendants note that, in making these allegations, Plaintiffs rely on the recollection of two "confidential" sources and one other witness, and fail to attach to the Complaint the actual underlying contract documents upon which Plaintiffs' allegations are based.   Defendants argue that, for purposes of determining the sufficiency of the Complaint, this

Court should consider the contract documents.   According to Defendants, because the contract documents directly contradict the allegations in the Complaint, Plaintiffs have failed to allege a material misrepresentation based on any of Defendants' statements regarding a 90 percent efficiency requirement, the GGE purchase order amendments, or the ES System order.

On a motion to dismiss, the Court must consider not only the complaint, but also "documents incorporated into the complaint by reference." *Tellabs*, 551 U.S. at 322.   "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997); *see also Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) ("[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.")   Indeed, "[i]f the rule were otherwise, a plaintiff with a deficient claim could survive a motion to dismiss simply by not attaching a dispositive document upon which the plaintiff had relied." *GFF*, 130 F.3d at 1385.   Further, if the documents central to a plaintiff's claim "contradict the allegations of the amended complaint, the documents control and [the] Court need not accept as true the allegations in the [] complaint." *Rapoport v. Asia Elec. Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Here, EMCORE's contracts with GGE and ES System are central to Plaintiffs' claims of material misstatements by Defendants.   Accordingly, Defendants were entitled to submit "indisputably authentic copies" of those contracts to the Court for consideration on their motion to dismiss.   Plaintiffs, however, dispute the authenticity of the documents attached to Defendants' motion.   In particular, Plaintiffs question whether these documents represent the final, fully

10

executed versions of the contracts that set binding terms on the relevant parties.   Plaintiffs'

challenge is based in part on the fact that the documents are not "clean" copies, but rather contain

handwritten notes, and the fact that one of the documents contains language suggesting that further

negotiations were yet to be undertaken, and that, without the execution of "definitive agreements,"

no binding obligations were being created.

   Defendants argue that Plaintiffs do not actually dispute the authenticity of the documents,

and thus cannot prevent the Court from considering them.   The Court disagrees.   Plaintiffs

question whether these documents in fact are the contracts upon which their Complaint is based;

accordingly, their challenge is to the "substantive validity" of the documents attached to

Defendants' motion – documents which no one claims Plaintiffs have ever seen.   *Borders v.*

*Chase Home Finance L.L.C.*, No. 09-3020, 2009 WL 1870916, *4 (E.D. La. June 29, 2009).   This

case thus is distinguishable from those where courts have found that documents were properly

submitted in the context of a motion to dismiss, despite the plaintiff's challenge to those

documents.   *See id.* (considering settlement agreement on motion to dismiss where plaintiff

challenged only the lack of authentication of the agreement, but did not challenge its substantive

validity); *Martinez v. Welk Group, Inc.*, No. 09 CV 2883, 2011 WL 90313 (S.D. Cal. Jan. 11,

2011) (finding plaintiff's attempt to dispute authenticity of document unsupported, when plaintiff

had read and received a copy of the document, and the document was explicitly referenced in, and

helped define the terms of, another document referenced in the complaint); *Keithly v. Intelius Inc.*,

764 F. Supp. 2d 1257 (W.D. Wash. 2011) (considering screen shots of pages plaintiffs would have

seen when they purchased defendants' products on the internet, where plaintiffs did not

"affirmatively identify any discrepancies between the webpages they saw and those presented by

defendants with their motion"; the court specifically noted that its consideration of those

11

documents was "without prejudice to plaintiffs' ability to conduct discovery regarding the accuracy and authenticity of the screen shots presented by defendants").

The Declaration of Greg Watson, submitted with Defendants' reply brief, does not change this analysis. *See* Doc. 91-1. That Mr. Watson does not dispute the authenticity of the documents submitted by Defendants does not inexorably lead to the conclusion that these documents are "indisputably authentic." Because these documents remain subject to reasonable dispute, and because Plaintiffs dispute their authenticity, the Court is foreclosed from considering them in deciding Defendants' motion to dismiss.

In arguing that the Complaint fails to state a claim of a material misrepresentation based on statements concerning the GGE and ES System contracts, Defendants rely solely on the contract documents attached to their motion. Without the benefit of those documents, there is no basis for the Court to find insufficient the allegations regarding statements about the GGE and ES System contracts. Accordingly, the Court finds that Plaintiffs have satisfied the first requirement in pleading a claim of securities fraud as to these statements.

### 2.   Statements Concerning Other EMCORE Customers

In the Complaint, Plaintiffs include references to transactions with EMCORE customers other than GGE and ES System, but fail to allege any basis to conclude that those statements were false when made. Rather, Plaintiffs merely assert that the statements were false and misleading due to the allegations concerning GGE and ES System. Those customers, however, are separate entities with no alleged connections to GGE, ES System, or the efficiency requirements allegedly contained in the GGE contracts. Thus, there are no well-pled allegations that any of the statements relating to EMCORE's other customers were false or misleading when made. For example, in paragraph 57, Plaintiffs allege that Defendant Richards "misled" investors when

12

announcing two additional contract awards.   Nowhere, however, do Plaintiffs allege that

EMCORE was not, in fact, ever awarded those contracts, or that the statements concerning those

orders were false or misleading in some other way.   Because Plaintiffs fail to "specify each

statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading" with respect to customers other than GGE and ES System, the Complaint's

allegations relating to those other customers must be dismissed.   *Tellabs*, 551 U.S. at 321; *see also*

*Grossman v. Novell*, 120 F.3d 1112, 1126 (10th Cir. 1997) (affirming dismissal where plaintiff

failed to "set forth an explanation as to why the statement or omission complained of was false or

misleading" when made).

  B.   Scienter

  Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2).

The required state of mind in a securities fraud case is "a mental state embracing intent to deceive,

manipulate or defraud, or recklessness."   *Adams*, 340 F.3d at 1105 (citation omitted).

"Recklessness" means "conduct that is an extreme departure from the standards of ordinary care,

and which presents a danger of misleading buyers or sellers that is either known to the defendant or

is so obvious that the actor must have been aware of it."   *City of Philadelphia v. Fleming Co., Inc.*,

264 F.3d 1245, 1260 (10th Cir. 2001).   Where the alleged misrepresentation is based on the

non-disclosure of material facts, plaintiffs must plead facts demonstrating that the defendant knew

(1) of the potentially material fact; and (2) that failure to reveal the potentially material fact would

likely mislead investors.   *See id.* at 1259.   Under a recklessness standard, this knowledge

requirement may be satisfied "by the defendant's knowledge of a fact that was so obviously

material that the defendant must have been aware both of its materiality and that its non-disclosure

would likely mislead investors."   *Id.* at 1260.

On a motion to dismiss, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individualized allegation, scrutinized in isolation, meets that standard."   *Tellabs*, 551 U.S. at 323 (emphasis in original). This "inquiry is inherently comparative."   *Id.*   Accordingly, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."   *Id.* at 323-24.   The inference of scienter "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations."   *Id.* at 324.   In other words, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."   *Id.*   The question thus before this Court is whether, "[w]hen the allegations [of the Complaint] are accepted as true and taken collectively, [] a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference."   *Id.* at 326.

### 1.   Statements Concerning the GGE and ES System Contracts

Defendants argue that the Complaint does not sufficiently plead that any of the Defendants acted with the requisite scienter in connection with EMCORE's alleged misrepresentations regarding the GGE and ES System contracts.   Plaintiffs allege that, in their announcements of purchase orders by GGE and ES System and in their reports of EMCORE's order backlog, Defendants knowingly or recklessly misrepresented EMCORE's order backlog by failing to make the following three disclosures: (1) EMCORE was unable to meet the efficiency requirements of the GGE contracts, and thus would be unable to fulfill GGE's first two purchase orders; (2) GGE's third purchase order was not in addition to the first two purchase orders, but actually replaced

14

those orders; and (3) ES System's order actually reduced GGE's final purchase order.   The

Complaint includes both direct allegations of scienter as to each of these alleged non-disclosures,

and allegations of motive and opportunity by Defendants to misrepresent EMCORE's backlog

from which scienter may be inferred.

    With regard to the first alleged non-disclosure, the Complaint's only direct allegation of

scienter is that "Emcore knew that it could not fulfill GGE's first two purchase orders for cells."

Doc. 79 ¶ 105.   Similarly, with regard to the second alleged non-disclosure, the Complaint

alleges that, in executing the final GGE purchase order, "the two prior purchase orders were

nullified, the price term was modified to $13 per unit, and [] Green and Gold and Emcore signed

off on the changes."   *Id.* ¶ 103.   Finally, with regard to the third alleged non-disclosure, the

Complaint alleges that "Watson told Emcore that [as a result of ES System's order,] GGE's

purchase order was reduced by two million receivers."   *Id.* ¶ 104.

    As an initial matter, while these allegations attribute knowledge to "EMCORE," generally,

they fail to attribute knowledge to any of the Individual Defendants, specifically.   The PSLRA's

particularity requirements, however, "foreclose plaintiffs from pleading that facts about the

defendants, as a group, are sufficient to give rise to a strong inference of scienter."   *In re*

*Thornburg Mort., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1199 (D.N.M. 2010).   These allegations

thus fail to present, as they must, facts "giv[ing] rise to a strong inference that each individual

defendant acted with scienter."   *Id.*

    Further, these allegations contain only conclusions – "Emcore knew," "Emcore signed

off," "Watson told Emcore," – rather than particularized facts.   It is clear, however, that

"Plaintiffs cannot meet the pleading requirements by merely stating conclusory allegations such as

defendants had actual knowledge or were recklessly indifferent."   *Anderson v. First Sec. Corp.*,

249 F. Supp. 2d 1256, 1270 (D. Utah 2002).   Specifically, these allegations fail to include the

requisite "particularized facts" establishing: (1) which individuals at EMCORE had information

regarding the GGE efficiency requirements and EMCORE's ability to meet those requirements,

what specific information they had, or how and when they obtained that information; (2) which

individuals at EMCORE approved the third GGE purchase order, what specific information they

had about the effect of that purchase order, or how and when they obtained that information; and

(3) which individuals at EMCORE were told by Watson that ES System's order reduced the prior

GGE orders, what specific information Watson provided, or how and when he provided it.

 The Complaint also alleges that EMCORE held weekly contracts review meetings, where

"the participants discussed 'in detail' orders in the pipeline, pending orders, and orders in process

of fulfillment," and weekly revenue meetings, where "the participants discussed revenue

recognition on purchase orders, including a detailed status report of each program, backlog, what

revenue could or could not be recognized on specific purchase orders and other financial matters."

Doc. 79 ¶¶ 107, 109.   Further, the Complaint alleges that "the fact that the original cell orders

from GGE that Emcore could not fulfill remained in the order backlog was discussed several times

in the weekly contracts review meetings."   *Id.* ¶ 107.

 These allegations "are also too general to support an inference of scienter."   *The Sorkin,*

*LLC v. Fischer Imagine Corp.*, No. Civ. A. 03-CV-00631, 2005 WL 1459735, *8 (D. Colo. June

21, 2005) (allegations describing meetings where there were discussions about how to accelerate

sales were too general to support an inference of scienter without specific facts about who was

present and what information was presented).   First, the fact that executives of EMCORE

attended weekly contract review and revenue meetings does not even hint at knowledge of the

misrepresentations at issue here.   Further, even the allegations regarding discussions of retaining

"defunct cell orders" in EMCORE's backlog are too vague to provide the necessary detail as to

when those discussions took place, what part, if any, each Defendant played in those discussions,

or, most importantly, whether those discussions involved any of the facts allegedly known, but not

disclosed, by Defendants.  "Without [such] specific facts . . . there is no way to determine whether

the matters discussed involved" the misrepresentations identified by Plaintiffs in support of their

fraud claim.  *Id.*

In addition to these direct allegations of scienter, Plaintiffs allege that Defendants should

be charged with knowledge of the falsity and materiality of EMCORE's statements because they

were "Emcore's top executive officers charged with not only developing Emcore's business

strategy, but also overseeing the implementation and execution of that strategy during the Class

Period."  Doc. 79 ¶ 100.  The Tenth Circuit has rejected similar efforts to impute scienter to

defendants based on their "senior positions in the company," explaining:  "allegations that a

securities fraud defendant, because of his position within the company, 'must have known' a

statement was false or misleading are precisely the types of inferences which [courts], on

numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny."

*Fleming*, 264 F.3d at 1263 (citation omitted).  Accordingly, "the mere fact that the individual

Defendants occupied senior positions in the company . . . is not sufficient to imply knowledge of

the specific fact of [falsity or] materiality."  *Id.* at 1264.

This analysis is not altered by Plaintiffs' contention that the solar terrestrial business was a

"core-operation" of EMCORE.  Plaintiffs are correct that "[a]llegations that rely on the

core-operations inference are among the allegations that may be considered in the complete

PSLRA analysis," in accordance with the holistic approach outlined in *Tellabs*.  *South Ferry LP,*

*#2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  Nonetheless, where "a complaint relies on

allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standards." *Id.* Here, the Complaint alleges that, by virtue of their position in the company, the Individual Defendants "monitored" and "knew, based on their review of such information, that their alleged Class Period misrepresentations were false or misleading and omitted material information." Doc. 79 ¶ 100. This conclusory allegation, however, is not followed with any particularized facts to demonstrate any monitoring or review by any Defendant of any information.[1] Accordingly, the Complaint contains no additional detailed allegations about Defendants' actual exposure to information. In the absence of such additional detailed allegations, Plaintiffs' conclusory allegations that Defendants were "top executive officers" charged with important responsibilities fall short of the PSLRA standards.

Moreover, the Complaint contains no allegations to suggest that the nature of the relevant facts allegedly known and not disclosed by Defendants were "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Id.* at 786. Accordingly, this is not "the rare circumstance" in which core-operations allegations might "conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations." *Id.*

Plaintiffs also allege that Defendants had a motive for their conduct, as they were launching their terrestrial solar business at a time when EMCORE's "cash reserves [were] rapidly dwindling" and the company "was embroiled in a[ regulatory] investigation" regarding options backdating. Doc. 79 ¶¶ 4, 24, 25. Accordingly, Plaintiffs allege that "nothing was more

---

[1] Although the Complaint alleges that Defendants reviewed "such information," Doc. 79 ¶ 100, Plaintiffs never explain what this "such information" is. There is no sentence preceding or following this allegation to clarify the information allegedly reviewed.

important to defendants than making sure that Emcore appeared as a viable concern, with a strong revenue stream and backlog of business so that it could continue to make acquisitions and raise desperately needed capital."   ¶ 100.   These alleged motives – namely, to present the company as successful, to facilitate corporate transactions, and to raise capital – are all "generalized motives shared by all companies" and as such, are not helpful in establishing scienter.   *Fleming*, 264 F.3d at 1269 (motive to facilitate corporate transaction does not create inference of scienter); *see also Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("[T]he motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud."); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 678 (D. Colo. 2007) (desire for company to appear successful is shared by all corporate managers and does not comprise a motive for fraud).   Further, the fact that EMCORE underwent a regulatory investigation, which, notably, was concluded with no charges of securities law violations being brought, "is too speculative to add much, if anything, to an inference of scienter."   *Cozzarelli*, 549 F.3d at 628 n.2; *see also In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 962 (8th Cir. 2008) ("the SEC's opening and closing an investigation . . . does [not] add an inference of scienter.").

Finally, Plaintiffs allege that, during the Class Period, Defendant Hou "engaged in insider sales which further support a strong inference of scienter."   Doc. 79 ¶ 110.   Plaintiffs allege that Hou's trading was suspicious both in amount and in timing, "deviate[d] wildly from his prior trading practices," and was not "part of a regular pattern of trading."   *Id.* ¶¶ 111-113.

"In order to infer scienter, insider stock activity must be 'unusual.'"   *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002).   In turn, insider trading is unusual or "suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."   *Zucco*

19

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (citation omitted).   Thus, "[f]or individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Id.* (citation omitted).   Plaintiffs are "not excused from pleading the relevant [trading] history," regardless of whether such history is available.   *Id.*   "A 'meaningful trading history' requires information on non-Class Period sales, the amount of stock retained by the Defendants, or . . . whether the amount of stock owned by the Defendants actually increased during the Class Period." *Konkol v. Diebold*, 590 F.3d 390, 399-400 (6th Cir. 2010).

Here, Plaintiffs have failed to provide any meaningful trading history.   Specifically, Plaintiffs fail to identify the amount of stock that Hou owned before or after the allegedly suspicious sales, the amount or value of Hou's stock remaining after the sales, the nature of the transaction by which Hou sold his stock, Hou's stock sales and purchases prior to the Class Period, and whether Hou purchased stock during or after the allegedly suspicious sales.   Absent such background information confirming the suspicious nature of the transactions identified in the Complaint, the allegations regarding Hou's sales of stock fail to create an inference of scienter. *See Zucco*, 552 F.3d at 1006 (no inference of scienter could be gleaned from the plaintiff's stock sale assertions where complaint contained no allegations that defendants' stock sales, though significant, were inconsistent with usual trading patterns); *Konkol*, 590 F.3d at 400 (stock sales during class period did not by themselves raise a strong inference of scienter absent "key" background information).

As directed by *Tellabs*, the Court has assessed Plaintiffs' allegations holistically.   *Tellabs*, 551 U.S. at 326.   Based on this assessment, the Court concludes that, "taken collectively," these allegations do not give rise to a "cogent and compelling" inference that Defendants intentionally or

recklessly misrepresented EMCORE's contracts with GGE and ES System and its order backlog as a result of those contracts.  *Id.* at 323.  "[A] reasonable person" would not deem the inference that Defendants acted with intent to defraud, or even recklessness, "at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  Accordingly, Plaintiffs have not adequately pled scienter with regard to Defendants' statements about the GGE and ES System contracts.

2.   <u>Statements Concerning Other EMCORE Customers</u>

Plaintiffs fail to plead any facts to support an inference of scienter with respect to EMCORE customers other than GGE or ES System.   With respect to each of the non-GGE or ES System customers, the Complaint merely incorporates the portion of the Complaint entitled "Scienter."   Plaintiff's scienter allegations, however, mention only GGE and ES System, and fail to allege that any of the Defendants had knowledge that contracts with any other customers were improper.   Given that Plaintiffs have failed to allege any connection between these customers and GGE or ES System, or the purported GGE efficiency requirements, there are no allegations capable of supporting an inference of scienter.   The Complaint's allegations relating to other EMCORE customers thus must be dismissed on this additional basis.

C.   <u>Loss Causation</u>

The sixth element of a private securities fraud action, loss causation, requires that a plaintiff show that each alleged misrepresentation or omission proximately caused the plaintiff's economic loss.   15 U.S.C. § 78u-4(b)(4); *Dura*, 544 U.S. at 345.   "[T]o establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Lentell v. Merrill Lynch &*

21

*Co.*, 396 F.3d 161, 173 (2d Cir.), *cert. denied*, 546 U.S. 935 (2005).

While "neither the Rules nor the securities statutes impose any special further requirement [beyond the notice requirements of Fed. R. Civ. P. 8(a)(2)] in respect to the pleading of proximate causation or economic loss, . . . even so, the 'short and plain statement' must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura*, 544 U.S. at 346 (citation omitted).   A complaint that fails to "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation . . . fails this simple test." *Id.*   Indeed, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that plaintiff has in mind." *Id.* at 347.

In *Dura*, the Supreme Court held that loss causation may not be established by simply alleging that a stock was purchased at an artificially inflated price. *Id.* at 345.   Rather, to sufficiently plead loss causation, a plaintiff must allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is in some way connected with a drop in stock price. *Id.* at 346-47.   Accordingly, "*Dura* makes clear that a particular misrepresentation . . . 'will not have caused any loss' to an investor unless the 'relevant truth' about that misrepresentation is made known to the public." *Marsden v. Select Med. Corp.*, No. 04-4020, 2007 WL 1725204, *2 (E.D. Pa. June 12, 2007) (quoting *Dura*, 544 U.S. at 342).   Plaintiff thus must "show both that corrective information was revealed and that this revelation caused the resulting decline in price." *In re Williams Sec. Litig – WCG Subclass.*, 558 F.3d 1130, 1140 (10th Cir. 2009).   Although "the disclosure need not precisely mirror the earlier misrepresentation, . . . it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.*

22

Here, Defendants argue that Plaintiffs have failed to plead loss causation, because their Complaint is devoid of any allegation that the purported misrepresentations upon which Plaintiffs base their claims were ever publicly disclosed, much less that this disclosure caused EMCORE's stock price to fall.   At the heart of Plaintiffs' allegations is that Defendants misrepresented EMCORE's order backlog by failing to disclose, in either their announcement of purchase orders by GGE and ES System or their reports of EMCORE's order backlog, that: (1) EMCORE was unable to meet the efficiency requirements of the GGE contracts, and thus would be unable to fulfill GGE's first two purchase orders; (2) GGE's third purchase order was not in addition to the first two purchase orders, but actually replaced those orders; and (3) ES System's order actually reduced GGE's final purchase order.   Doc. 79 ¶¶ 103-106.   The Complaint alleges that "the nature and extent" of these misrepresentations was revealed through the Citron Report and the Canaccord Report.   *Id.* ¶ 117.   The substance of these reports, however, as described and quoted in the Complaint, belies this allegation.

The Citron Report decried EMCORE as being founded on "illusions," and accused the company of stringing "together a group of sham deals."   Doc. 79 ¶ 82.   The basis for this accusation was Citron's skepticism regarding GGE and its perceived financial inability to fulfill its commitments to EMCORE.   *Id.*   Because Citron did not believe that GGE would make any further payments to EMCORE pursuant to its purchase orders, Citron found it "the height of corporate malfeasance" for EMCORE to use the funds expected from future sales to GGE "as part of its revenue guidance."   *Id.* The Citron Report also "questioned the *bona fides* of four additional EMCORE customers."   *Id.*   Similarly, citing to "confusion over what was funded and won," possibly due to translation issues, the Canaccord Report questioned the ability of ES System to deliver fully on its contract with EMCORE.   *Id.* ¶¶ 94-95.   As a result, Canaccord downgraded

23

EMCORE's stock to "HOLD," noting that the stock "adequately reflects the risk."   *Id.* ¶ 95.

Neither of these reports revealed EMCORE's inability to meet the efficiency requirements of the GGE contracts, the fact that GGE's third purchase order replaced its first two orders, or the fact that ES System's order reduced GGE's final purchase order.   Accordingly, while both the Citron Report and the Canaccord Report contain "revelations" that "suggest that analysts were pessimistic about [EMCORE's] future, the information contained in [these reports] does not identify, reveal or correct" any of the prior misrepresentations identified by Plaintiffs as the basis for their fraud claims.   *In re TECO Energy, Inc. Sec. Litig.*, No. 8:04-CV-1948, 2006 WL 845161, *4 (M.D. Fla. Mar. 30, 2006).   Because Plaintiffs point to no "curative disclosure" other than the Citron Report and the Canaccord Report, Plaintiffs fail to allege that Defendants' fraudulent statements and omissions were *ever* disclosed to the market, thereby affecting the price of EMCORE's stock.   *In re Tellium, Inc. Sec. Litig.*, No. 02CV5878, 2005 WL 2090254, *3 (D.N.J. Aug. 26, 2005) ("loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").[2]

In their response, Plaintiffs broadly paint their allegations of fraud as identifying a "scheme to misleadingly tout the strength of the Company's business and specifically the Company's terrestrial solar product sales."   Doc. 87 at 30.   Based on that broad description, Plaintiffs argue the causal connection between the fraud and the Citron and Canaccord Reports as follows:

> [T]he Citron Report and Canaccord Adams Report revealed to the public, at least
> partially, the weakness in EMCORE's solar terrestrial business and the truly
> questionable nature of the quality and quantity of EMCORE's reported backlog of

---

[2] Defendants note that the "disconnect" between the Complaint's allegations of fraudulent statements and omissions, on the one hand, and the disclosures in the Citron and Canaccord Reports, on the other hand, results from the fact that Plaintiffs abandoned their original theory of liability, which was based on the allegation that GGE was a "sham" company, yet continue to identify the same "curative disclosure" in their effort to plead loss causation.   Doc. 91 at 3-4 n.2.

terrestrial solar product orders and in particular the contracts with GGE and ESS.

*Id*. at 31.   Essentially, Plaintiffs argue that the Complaint adequately alleges loss causation

because Defendants' misrepresentations can be described as having presented EMCORE's solar

terrestrial business as "strong," while the revelations in the Citron and Canaccord Reports can be

described as presenting EMCORE's solar terrestrial business as "weak."

The Court disagrees that the allegations of the Complaint may be read at such a high level

of generality in determining whether Plaintiffs have adequately pled loss causation.   *Dura* makes

clear that, even under the notice pleading standard, "defrauded investors must plead that the very

misrepresentation at issue proximately caused them an economic loss."   *Nat'l Junior Baseball*

*League v. Pharmanet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 559 (D.N.J. 2010).   Plaintiffs have not

done this, even when the Complaint is read liberally and with all inferences drawn in their favor.

The only "truth" revealed in the Citron and Canaccord Reports was the inability of GGE and ES

System to meet their contractual obligations to EMCORE.   In contrast, the only

misrepresentations identified by Plaintiffs were Defendants' statements and omissions regarding

EMCORE's own abilities to meet the GGE contracts, the third GGE Order and the ES System

order.   There thus are simply no allegations in the Complaint demonstrating that the truth

regarding the "very misrepresentations at issue," – as opposed to the "truth" regarding another

"weakness" of EMCORE's solar terrestrial business – was actually revealed to the market in either

the Citron Report or the Canaccord Report.

Rather than "relate back to the misrepresentation[s]," the only disclosures identified by

Plaintiffs as the cause of their losses relate to "other negative information about the company," *i.e.*,

the inability of GGE and ES System to meet their contractual obligations to EMCORE.   *Williams*,

558 F.3d at 1140.   Plaintiffs thus have "not shown why these disclosures should be considered

'corrective' such that corresponding losses could be reliably attributed to the revelation of fraud rather than other factors." *Id.; see also Nat'l Junior Baseball*, 720 F. Supp. 2d at 560 (dismissing complaint for failure to plead loss causation, where fraud alleged by plaintiffs was defendant's overstatement of its backlog by including unsigned orders therein, and disclosure alleged by plaintiffs was an analyst report questioning the quality of defendant's backlog); *Tricont'l Indus. Ltd. v. PriceWaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir.) (no loss causation where misrepresentations were not part of later corrective disclosure), *cert. denied*, 552 U.S. 824 (2007); *Teachers' Retirement Sys. of La. v. Hunter*, 477 F.3d 162, 186-87 (4th Cir. 2007) (dismissing claims where alleged disclosure did not match alleged fraud).   In the absence of such a showing, the Complaint is insufficient to plead loss causation.

II.     Count II:   Control Person Liability Claim

Plaintiffs bring their claim of control person liability pursuant to Section 20(a) of the Exchange Act, which states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).   "[T]o state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged control person."   *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998).   As set forth above, the Court has determined that Plaintiffs have not adequately alleged the elements of scienter or loss causation, and thus have failed to plead that Defendants violated Section 10(b) of the Exchange Act or Rule 10b-5.   Accordingly, Plaintiffs have not adequately pled a primary violation of the securities laws, and thus fail to meet the first requirement in

26

pleading a claim of control person liability.   For this reason, Plaintiffs' control person liability claims against the Individual Defendants, asserted in Count II of the Complaint, must be dismissed.   *See Fleming*, 264 F.3d at 1271.

## CONCLUSION

With regard to statements concerning EMCORE customers other than GGE and ES System, Plaintiffs have failed to adequately plead a material misrepresentation, scienter, or loss causation.   With regard to statements concerning GGE and ES System, Plaintiffs have adequately pled a material misrepresentation, but have failed to adequately plead scienter or loss causation. Plaintiffs thus have failed to state a claim of securities fraud under Section 10(b) and Rule 10b-5. For this reason, Count I of the Complaint must be dismissed.

Because Plaintiffs have failed to plead a primary violation of the securities laws, they also have failed to meet the first requirement in pleading a claim of control person liability.   Plaintiffs thus have failed to state a claim of control person liability under Section 20(a).   For this reason, Count II of the Complaint also must be dismissed.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Corrected Consolidated, Amended Complaint [Doc. 81] is **GRANTED**.

DATED this 28th day of September, 2012.

_____
MARTHA VÁZQUEZ
United States District Court Judge

27